J-A08007-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: W.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.P., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2974 EDA 2024 |

Appeal from the Order Entered November 4, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001126-2023

BEFORE:  LAZARUS, P.J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, P.J.:        **FILED AUGUST 18, 2025**

W.P. (Child), a minor,[1] appeals from the order, entered in the Court of Common Pleas of Philadelphia County, Juvenile Division, denying the Philadelphia Department of Human Services' (DHS) petition for dependency.[2] We affirm.

---

[1] Child is represented on appeal by the Defender Association of Philadelphia, Child Advocacy Unit.  DHS has not filed a brief in this matter.  See Letter from the City of Philadelphia DHS, 1/29/25.

[2] The court's order reads as follows:

> The Child is not Dependent pursuant to the Pennsylvania Juvenile Act and [] the petition for dependency is dismissed. Any temporary legal and physical custody by the Philadelphia County Human Services of the Child shall be discharged.  . . .  Mother is ready[,] willing[,] and able to care [for Child].  Child advocate and DHS to cooperate for [Child's] safe return back to Brazil.

Order of Adjudication and Disposition, 11/4/24.

In 2021, when Child was fourteen years old, he came to the United States[3] to live with his maternal uncle, W.M. (Uncle) and an unidentified aunt. His parents remained in Brazil. Child's parents were told that he was going to school, but, according to Child, he was working in Uncle's auto shop for approximately two years, six days a week, and he was never enrolled in school. *See* N.T. Adjudicatory Hearing, 11/4/24, at 40-41. Child testified Uncle mistreated him. *Id.* at 42.

On December 13, 2023, DHS received a Child Protective Services (CPS) report alleging that Child was being labor-trafficked by Uncle. On December 20, 2023, DHS obtained an order of protective custody (OPC); Child was placed in a group home and eventually in a foster home. The court held a shelter care hearing on December 22, 2023. Following the hearing, the court placed Child in the temporary custody of DHS.

On January 4, 2024, DHS filed a dependency petition, and the court listed the matter for an adjudicatory hearing on February 1, 2024. The adjudicatory hearing, continued five times, was ultimately held on November 4, 2024. Mother, who lives in Brazil, did not attend the hearing, but was represented at the hearing by Robin Banister, Esquire.

_____

[3] It appears Child was abandoned at the airport in New York by the person who accompanied him on the flight from Brazil. Police contacted Uncle, who is Mother's brother, in Philadelphia. Child testified: "I came here because the guy that brought us said he was going to bring my mother afterwards, but when we got to the airport the guy that brought me abandoned me. . . . He was my mom's ex's friend." N.T. Adjudicatory Hearing, 11/4/24, at 36.

On November 4, 2024, following the hearing, the court entered an order finding Child was not dependent, discharging the dependency petition, and discharging the temporary commitment to DHS. On November 11, 2024, Child filed a motion for reconsideration[4] and an application for a stay of the discharge of the dependency petition and commitment to DHS. On November 27, 2024, Child filed a notice of appeal, and, on December 3, 2024, Child filed an application for stay in this Court.

On December 13, 2024, this Court entered an order remanding the case for the trial court to address the application for stay. On December 16, 2024, the trial court denied the motion to stay the order, finding Child did not meet the statutory definition of a "dependent" child pursuant to 42 Pa.C.S.A. § 6302(1), because Mother was "ready, willing, and able to care for [] Child." Order, 12/16/24. The trial court found Child's needs and welfare would be best served in Mother's care and that it would be in Child's best interest "to be reunited with his Mother forthwith." *Id.* Thereafter, Child sought a stay in this Court. On January 30, 2025, this Court entered the following order:

> The "Application for Stay," filed December 26, 2024, by the Child Advocate on behalf of Child to stay the Order of November 4, 2024, is GRANTED, in part, and DENIED, in part, in the best interest of the Child. The November 4, 2024 Order is STAYED except for the directive that DHS and Child Advocate continue the process of obtaining Child's birth certificate from the Consulate in New York.

_____

[4] The court did not act on the motion for reconsideration, and it was denied by operation of law. *See* Pa.R.A.P. 1701(b)(3) - Explanatory Note.

- 3 -

Per Curiam Order, 1/24/25.

On appeal, Child raises the following issues:

1. The trial court erred as a matter of law and abused its discretion by not adjudicating Child dependent when the evidence presented by [DHS] and Child established, by clear and convincing evidence, that Child was a dependent child under the Juvenile Act, 42 Pa.C.S.[A.] § 6302.

2. The trial court erred as a matter of law and abused its discretion by not adjudicating Child dependent in a manner that effectuated the purposes of the Juvenile Act, where DHS and Child presented clear and convincing evidence for the trial court to conclude that adjudicating Child dependent best served Child's needs and welfare under 42 Pa.C.S.[A.] § 6301(b)(1.1).

Appellant's Brief, at 3.

The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the juvenile court if they are supported by the record; but it does not require the appellate court to accept the juvenile court's inferences or conclusions of law. *Interest of I.R.-R.*, 208 A.3d 514, 519 (Pa. Super. 2019) (citing *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)). As such, we review for an abuse of discretion. *Id.* The appellate court must ensure that the record represents a comprehensive inquiry and that the trial court has applied the appropriate legal principles to the record. *See In re L.B.*, 229 A.3d 971, 977 (Pa. Super. 2020).

At the adjudicatory hearing, the court heard testimony from various individuals and representatives of agencies that were instrumental in protecting Child and obtaining foster care placement for him. Additionally, the

court heard from Child, who is doing well in placement and in school. However, the court determined the evidence did not support a finding of dependency where Mother was ready to care for Child:

> Based on the evidence that I have received, all of the allegations are as to the uncle [from] whom he's been removed or actually escaped. There are no allegations indicating that his mother is in any way unable to care for her son. [DHS] appropriately followed up with the Brazilian government in order to obtain the necessary reports that are reflected in [Exhibits] DHS-1 and DHS-2 [International Social Services Home Study.][5] It appears we have a ***Justin S.***[6] case, where the mother has presented herself as ready, willing, and able. I have no idea where the father is. However, [M]other appears to have expressed that she wants to care for [Child], and I have not heard anything to indicate otherwise. I cannot under these circumstances adjudicate [Child]

---

[5] The report reads, in part:

> [Mother] said her biggest dream in life right now is to pick up her children at the airport. [She] feels a lot of guilt and regret, which can be seen not only in her words but in her countenance when she tells the story of having authorized her children to go to the U.S in July 2022 since she was organizing to go in September of the same year. It turns out that when [Mother] tried to migrate, Mexico's borders were closed and[,] sometime later, the person who would lend her the money to emigrate no longer had a way to help her. Since then, [Mother] has been trying to bring her children back to Brazil. She says that [Child,] since he arrived, wants to return, while [Mother] herself advised her son to seek some police service in the United States and said that he was without his mother and wanted to return to Brazil.

Exhibit DHS-1, at 4.

[6] ***In the Interest of Justin S.***, 543 A.2d 1192, 1197 (Pa. Super. 1988) ("Only if the court concludes by 'clear and convincing evidence' that proper parental care and control are not available will it adjudicate a child dependent, and, absent such a finding, custody must be returned to the parents immediately."). ***See also*** 42 Pa.C.S.A. § 6302.

> dependent. The Child Advocate and [DHS] are to cooperate in terms of working with the Brazilian government for safe transport back to Brazil.

N.T. Adjudicatory Hearing, 11/4/24, at 57.

After our review, we discern no reason to doubt the trial court's findings. Though our review is quite broad, it is fundamentally limited by our inability to nullify the factfinding responsibilities of the lower court. ***See Interest of I.R.-R.***, ***supra***. ***See also*** N.T. Adjudicatory Hearing, 11/4/24, at 10, 11 (Mother's counsel stating Mother "wants [Child] to return to her in Brazil[,] and Mother is "ready, willing, and able."). ***See also id.*** at 24 (Theo Ciccarellii Cornetta, Child Advocate Supervisor, testifying she talked with Mother "via the WhatsApp app," and Mother was "ready to care for [Child.]"); ***id.*** at 26 (Kristen Abney, DHS social worker, testifying Mother was employed in Brazil and that international home study indicated her home was "approved"); ***id.*** at 28-29 (January Llaverias, Child's case manager at Community Umbrella Agency, testifying Mother wants Child to come home to Brazil); ***id.*** at 53 (Stephanie Lubert, Child's immigration attorney, testifying Child, an undocumented immigrant, has a "relatively strong case for a labor trafficking [-]based T visa.").[7]

---

[7] T nonimmigrant status is a temporary immigration benefit, generally granted for four years; T nonimmigrants who qualify may also be able to adjust their status and become lawful permanent residents, i.e., obtain a Green Card. **See** https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status (last visited 7/30/25).

After careful consideration of the notes of testimony from the adjudication hearing, the certified record, Child's brief, and the relevant case law, we affirm on the basis of the opinion authored by the Honorable Cateria R. McCabe. Accordingly, we lift the stay entered in this Court on January 30, 2025, and we affirm the trial court's order denying DHS's petition for dependency. We instruct the parties to attach a copy of Judge McCabe's decision in the event of further proceedings in this matter.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/18/2025

2021 DEC -3 PM 3: 29

**IN THE COURT OF COMMON PLEAS**
**FOR THE COUNTY OF PHILADELPHIA**
**FAMILY COURT DIVISION – DEPENDENCY BRANCH**

IN RE:

| | | |
|---|---|---|
| W.P., a minor, D/O/B: 01/04/2008 | : | CP-51-DP-0001126-2023 |
| | : | 51-FN-001777-2023 |
| | : | |
| APPEAL OF: W.P. | : | Superior Court No. 2974 EDA 2024 |

**OPINION**

## I.     INTRODUCTION

W.P. ("the Child"), by and through his Guardian Ad Litem/Child Advocate ("Appellant"), appeals from the Order entered by this Court on November 4, 2024, finding that the Child was not dependent. Testimony for the Adjudicatory Hearing was heard on November 4, 2024. The transcript is attached as Court's Exhibit A. At the close of the evidentiary hearing, the trial court found that clear and convincing evidence did not exist to adjudicate the Child dependent based on present inability because Mother was ready, willing, and able to care for the Child in Brazil. The Court discharged the Child's dependency petition on November 4, 2024, and ordered the Child Advocate and the Philadelphia Department of Human Services (DHS) "to cooperate for youth's safe return back to Brazil." (See Trial Court Order 11/4/2024). For the following reasons, this Court's decision should be affirmed.

## II.     FACTUAL and PROCEDURAL HISTORY

The relevant facts and procedural history of this case are as follows. DHS became aware of this family on December 19, 2023, when it received a Child Protected Services (CPS) report containing allegations that W.P. was being labor trafficked by this maternal uncle. During the

1

investigation, the Child stated that his Mother was told that he would be attending school while living with his uncle. He was never enrolled in school in Philadelphia. On December 19, 2023, DHS obtained an Order of Protective Custody (OPC) for the Child. Mother resided in Brazil and the Child was at risk for further abuse in the care of his uncle in Philadelphia. DHS filed a Dependency Petition on behalf of the Child on January 4, 2024.

An Adjudicatory Hearing was held on November 4, 2024.[1] Counsel for DHS called their first witness, DHS Investigator, Kristin Abney. (N.T. 11/4/2024, p. 14-26 (Exhibit A)). Ms. Abney testified that the Child entered DHS care in December 2023 due to allegations that the fifteen-year-old child was living with his uncle, was not enrolled in school, and instead worked in auto body shop throughout the day. (N.T. 11/4/2024, p. 15 at 2-21 (Exhibit A)). When Ms. Abney spoke to the Child about the allegations, the Child stated that when he immigrated to the United States, he was abandoned in New York. Police stopped him and called his uncle, who then picked him up. The Child stated that he began residing with his uncle in Philadelphia for approximately two years. (N.T. 11/4/2024, p. 16 at 6-24 (Exhibit A)). The Child also stated to Ms. Abney that he was never enrolled in school since arriving in the United States. He instead worked in an autobody shop with his uncle. He also told Ms. Abney that his uncle would physically threaten him if he did not "complete certain work tasks." (N.T. 11/4/2024, p. 16 at 25; p. 17 at 1-13 (Exhibit A)). The Child also stated that when he told Mother about the physical threats, she told him to "find a police station," which prompted the Child to flee from his uncle's home and contact the police. (N.T. 11/4/2024, p. 17 at 22-25; p. 18 at 1-2 (Exhibit A)). When questioned by Mother's counsel,

---

[1] The Adjudicatory Hearings scheduled for February 1, 2024, March 20, 2024, May 15, 2024, and July 3, 2024, were continued due to further investigation. The September 4, 2024, Adjudicatory Hearing was also continued due to further investigation. The Brazilian home study and criminal clearances were not completed and returned to DHS.

Ms. Abney testified that Mother's actions and response to the incident were appropriate. (N.T. 11/4/2024, p. 25 at 23-25; p. 26 at 1-7 (Exhibit A)).

Prior to immigrating to the United States, the Child resided with Mother in Brazil. Mother continues to reside in Brazil. When Ms. Abney spoke to Mother about the allegations via WhatsApp, Mother stated that the Child's uncle was supposed to enroll him in school in Philadelphia while the Child resided with him. Mother also stated that she wished for the Child to return to her care in Brazil and that she was ready to care for him. Ms. Abney also testified that the report was invalid, but she was not certain. (N.T. 11/4/2024, p. 18 at 7-14; p. 19 at 16-23; p. 24 at 22-24; p. 25 at 10-12 (Exhibit A)).

When Ms. Abney concluded her investigation, she testified that she submitted paperwork for an international home study on Mother's home in Brazil as well as for background clearances to be completed. The results of the international home study and the background clearances for Mother's home were entered in evidence as DHS-1 and DHS-2. They are attached as Court's Exhibit B. The clearances indicated that there was no criminal history found for Mother or the two other adults residing in the home. (N.T. 11/4/2024, p. 20 at 1-17 (Exhibit A)). On cross-examination by Mother's counsel, Ms. Abney testified that there was no information indicating that Mother was not ready, willing, and able to care for the Child. Ms. Abney also testified that Mother was employed in Brazil and that the international home study indicated that Mother's home was "approved." (N.T. 11/4/2024, p. 26 at 8-19 (Exhibit A)).

Counsel for DHS called their next witness, Community Umbrella Agency (CUA) Case Manager, January Llaverias. (N.T. 11/4/2024, p. 27-35 (Exhibit A)). Mr. Llaverias testified that he was assigned to this case in July 2024. Mr. Llaverias testified that when he spoke with Mother, she indicated that she wished for the Child to be returned to her care in Brazil and her position has never wavered. (N.T. 11/4/2024, p. 27 at 20-25; p. 28 at 24-25; p. 29 at 1-6 (Exhibit A)). When

Mr. Llaverias spoke to the Child regarding his wishes, the Child indicated that he wished to remain in the United States because he has a more comfortable life and more opportunities in the United States than in Brazil. When Mr. Llaverias spoke to the Child, he testified that the Child worked in a mechanic shop for at least six days out of the week and that his uncle never enrolled him in school. The Child told Mr. Llaverias that Mother knew this but felt she could not do anything about it because she was still in Brazil. He testified that the Child and Mother spoke "on and off." (N.T. 11/4/2024, p. 29 at 7-13; p. 30 at 4-16, 24-25 (Exhibit A)).

The Child also testified at the Adjudicatory Hearing. (N.T. 11/4/2024, p. 36-52 (Exhibit A)). He testified that he came to the United States when he was fourteen years old. The Child stated that he arrived with a family acquaintance who told him that he would bring his Mother afterward, however he was abandoned at the airport. (N.T. 11/4/2024, p. 36 at 16-23 (Exhibit A)). He testified that he did not know the man and that the man told immigration authorities that he was the Child's father so they could enter the country. The man's name was listed on the Child's birth certificate. (N.T. 11/4/2024, p. 37 at 1-11; p. 38 at 22-23 (Exhibit A)). The Child stated that he began residing with his uncle who immediately put him to work. He testified that he asked his uncle about being enrolled in school, but his uncle stated he had to "work and not study." The testimony reflected that he worked six days a week. The Child further testified that when he told Mother, she stated that she could not do anything about it. He also testified that he spoke to Mother approximately two or three times per week. The Child then testified that his uncle began hitting him shortly after he arrived and deliberately cut his arm while they were working. (N.T. 11/4/2024, p. 40 at 3-25; p. 41 at 1-24 (Exhibit A)). The Child told Mother about the incident and sent her pictures of the cut. Mother stated that she "couldn't believe he did that" to him. After Mother learned of the incident, she told the Child to leave his uncle's house and to go to the police. The Child listened, left his uncle's home, and did not return. (N.T. 11/4/2024, p. 41 at 23-24; p. 43 at 14-17; p. 44 at

7-8 (Exhibit A)). The testimony reflected that the Child sometimes told Mother when his uncle hit him, and that she believed him. However, the testimony reflected that Mother felt that there was nothing she could do to help the Child other than to tell him to go to the police. (N.T. 11/4/2024, p. 45 at 3-12 (Exhibit A)).

On cross-examination by Mother's counsel, the Child testified that the original plan was for him to come to the United States first and that Mother would meet him here thereafter. However, after the man abandoned the Child at the airport, Mother could no longer come to the United States. The Child further testified that when he resided in Brazil, he lived in a home with his Mother, grandmother, and his other siblings. The Child stated that some of his siblings still reside with Mother and grandmother, but that his younger brother currently resides in the United States. The Child testified that Mother told him she felt sorry for sending him and his brother to the United States. (N.T. 11/4/2024, p. 47; p. 48 at 17-20 (Exhibit A)). On cross-examination by counsel for DHS, the Child testified that when he resided with Mother in Brazil, he attended school, had enough food in the home, and felt safe in Mother's home. (N.T. 11/4/2024, p. 50 at 10-22 (Exhibit A)).

Following argument of counsel on November 4, 2024, this Court found that W.P. did not meet the definition of a dependent child pursuant to 42 Pa. C.S.A. §6302(1) of the Juvenile Act and that Mother was ready, willing, and able to care for the Child in Brazil. The Court discharged the Child's dependency petition on November 4, 2024 and ordered the Child Advocate and DHS "to cooperate for youth's safe return back to Brazil." (See Trial Court Order 11/4/2024). Appellant filed the present Notice of Appeal and a Concise Statement of Errors Complained of on Appeal on November 6, 2024.

## III. STATEMENT OF MATTERS COMPLAINED ON APPEAL

In the Pa. R.A.P. 1925(b) Statement of Matters Complained of on Appeal, regarding the April 17, 2024, Order, the Appellant identifies the following issue(s):

1. The Trial Court erred as a matter of law and abused its discretion by not adjudicating Appellant dependent when the evidence presented by the Department of Human Services ("DHS") and Appellant established, by clear and convincing evidence, that Appellant was a dependent child under the Juvenile Act, 42 Pa. C.S. §6302.

2. The Trial Court erred as a matter of law and abused its discretion by determining that Mother was a ready, willing, and able parent, where DHS and Appellant proved, by clear and convincing evidence, that Mother sent Appellant to the United States with an acquaintance, was aware of Appellant's mistreatment at the hands of his caretaker, and nonetheless did nothing to protect Appellant.

3. The Trial Court erred as a matter of law and abused its discretion by determining that Mother was a ready, willing, and able parent, where Mother was not immediately available to care for Appellant.

4. The Trial Court erred as a matter of law and abused its discretion by not adjudicating Appellant dependent in a manner that effectuated the purposes of the Juvenile Act, where DHS and Appellant presented clear and convincing evidence for the Trial Court to conclude that adjudicating Appellant dependent best served Appellant's needs and welfare under 42 Pa. C.S. §6301(b)(1.1).

5. Child Advocate reserved the right to amend this Concise Statement of Matters Complained of on Appeal upon receipt and review of the final transcript in this matter.

## IV. STANDARD OF REVIEW

The proper standard of review in dependency cases is abuse of discretion. "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." *Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007).

Our standard of review of dispositional orders in juvenile proceedings is settled. The Juvenile Act grants broad discretion to juvenile courts in determining appropriate dispositions. *In re C.A.G.*, 89 A.3d 704, 709 (Pa. Super. 2014). Indeed, the Superior Court will not disturb the lower court's disposition absent a manifest abuse of discretion. *In the Interest of J.D.*, 798 A.2d 210, 213 (Pa. Super. 2002). The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record but does not require the appellate court to accept the lower court's inferences or conclusions of law. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). Appellate review of a weight of the evidence claim is limited to a review of the judge's exercise of discretion. *See Commonwealth v. Widmer*, 689 A.2d 211 (Pa. 1997), and *Commonwealth v. Brown*, 648 A.2d 1177, 1189-1192 (Pa. 1994).

## V.    DISCUSSION

### A. The Trial Court did not Abuse its Discretion when it Found that Child Was Not Dependent Pursuant to 42 Pa. C.S.A. §6302(1) of the Juvenile Act

Appellant alleges in their Concise Statement of Matters Complained of on Appeal, that this Court erred when it found that clear and convincing evidence was not present to adjudicate the Child dependent because Mother was a ready, willing, and able parent. This Court disagrees.

The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets the statutory definition of dependency. *In re G.T.*, 845 A.2d 870, 872 (Pa. Super. 2004). Clear and convincing evidence has been defined as testimony by credible witnesses who clearly relate facts that are so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In Interest of J.M.*, 166 A.3d 408, 427 (Pa. Super. 2017) (citing *In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010)).

7

The Juvenile Act defines a dependent child, in relevant part, as a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian that places the health, safety, or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk." 42 Pa. C.S.A. § 6302(1). The purpose of the Juvenile Act is to preserve the unity of the family whenever possible. 42 Pa. C.S.A. §6301(b)(1). A dependency trial is a two-part process. The first part requires the trial court to hear evidence and to determine, by clear and convincing evidence, that the child is without proper parental care, control, or subsistence necessary for the child's physical, mental, moral, or emotional health. *In re A.B.*, 63 A.3d 345, 349 (Pa Super. 2013). If the trial court finds the child dependent, the trial court may then move to the second part, in which it must make an appropriate disposition based upon an inquiry into the best interests of the child. *In re I.C.*, II, 900 A.2d 378, 381 (Pa. Super. 2006). *See In re A.E.*, 722 A.2d 213, 215 (Pa. Super. 1998)).

In finding that the Child did not meet the statutory definition of a "dependent child" pursuant to 42 Pa. C.S.A. § 6302(1), this Court determined that clear and convincing evidence was not presented to demonstrate that the Child was without proper parental care and control. The trial court also based its determination on the Pennsylvania Superior Court's holding in *In the Interest of Justin S.*, wherein this Court held that "a court cannot adjudge a child to be dependent when his non-custodial parent is ready, willing, and able to provide the child with proper parental care and control." *In the Interest of Justin S.*, 543 A.2d 1192, 1199 (Pa. Super. 1988). At the November 4, 2024, Adjudicatory Hearing, Mother presented herself as ready, willing, and able to care for the Child. There were no dependency concerns or allegations asserted regarding Mother

in the dependency petition filed on January 4, 2024. It simply stated that she resided in Brazil. After being informed of the allegations in the dependency petition, Mother consistently maintained the position that she wished for her son to be returned to her care in Brazil. The circumstances that brought the Child into care were due to the actions of his uncle. They occurred outside of Mother's knowledge and control. It is clear to this Court that when sending the Child to live with his uncle in the United States, Mother believed that uncle would care for and enroll the Child in school. It is clear to this Court that Mother did not intend for the Child's uncle to force him to work rather than attend school. When Mother sent the Child to the United States, she planned to arrive here herself shortly thereafter. However, when the acquaintance who transported the Child to the United States abandoned him at the airport, his whereabouts become unknown. He did not help Mother come to the United States. The testimony and evidence reflected that Mother expressed remorse and regret for sending the Child to the United States.

The evidence and testimony also reflected that an international home study was conducted on Mother's home and the home was deemed to be appropriate. The home study indicated that Mother was employed and cared for two of the Child's siblings in Brazil. The Child's stepfather and maternal grandmother also reside in the home with Mother. The international home study also described Mother's willingness and motivation to care for the Child in great detail. Specifically, it stated that "her biggest dream in life right now is to pick up her children at the airport." The home study also outlined Mother's plan for providing for the Child's basic needs including her salary and access to medical and dental services in Brazil. (See DHS-1). Additionally, criminal clearances were done on Mother and the residents of her home. The results indicated that there was no criminal history found for Mother or the other two adults residing in the home. (See DHS-2).

There was no testimony presented that Mother failed to provide appropriate care for the Child when he resided with her in Brazil. The Child's uncontradicted testimony reflected that he was

enrolled in school when he resided with Mother in Brazil. He was well fed and felt safe in Mother's care. There was no testimony presented that Mother labor-trafficked the Child. In fact, the testimony reflected that Mother sent the Child to live in the United States to attend school, and that Mother was surprised to learn that the Child was not enrolled. When Mother later became aware that the Child was not attending school in his uncle's care, there was little she could do to rectify the situation from Brazil. Appellant asserts that this Court erred in determining that Mother was ready, willing, and able to care for the Child because Mother was aware of the Child's maltreatment in his uncle's care and "did nothing to protect" him. However, the testimony reflected that when Mother learned of the abuse by his uncle, she instructed the Child to leave the house and to go to the police. The Child heeded Mother's advice and has not resided with his uncle since then. Mother did all that she felt she could do to help her son while residing in another country. The DHS investigator also testified that Mother's actions were appropriate given the circumstances. There was also no testimony presented regarding Mother's inability to protect the Child from further abuse if he were returned to her care in Brazil. Additionally, there is no reason to believe that Mother would not reenroll the Child in school and provide for his needs in Brazil if he were returned to her care.

The fundamental purpose of proceedings under the Juvenile Act is to preserve the unity of the family whenever possible. During the DHS investigation, the Child initially stated that he wished to return to Mother's care in Brazil. (See Dependency Petition Paragraph C). While the Child may now prefer to remain in the United States, his reasons are not supported by the Juvenile Act. The opportunities that are available in the United States rather than in Brazil do not make this Child dependent. Additionally, the Child's preferences must be weighed against Mother's right to parent her child. The Child felt safe and well cared for in Mother's home and was attending school there. Two of his siblings reside in the home as well as his maternal grandmother and stepfather. The

10

Child has many familial supports in Brazil who are willing to assist him and Mother. To allow this Child to remain in foster care and separated from his family when Mother is a ready, willing, and able parent would be contrary to the purpose of the Juvenile Act. Applying the holding in *Justin S.*, this Court properly found that W.P. did not meet the definition of a dependent child pursuant to 42 Pa. C.S.A. § 6302(1). Thus, this Court properly determined that the Child's needs and welfare would be best served in his Mother's care.

## VI.  **CONCLUSION**

For these reasons, this Court respectfully requests that the Order dated November 4, 2024, be AFFIRMED.

BY THE COURT:

Date: _December 3, 2024_

Cateria R. McCabe, Judge

11

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing opinion has been filed and served upon the following parties, as set forth below:

**PACFILE**

**Guardian Ad Litem:**
Theo Ciccarelli Cornetta. Esquire
Defender Association of Philadelphia
1441 Sansom Street. 9th Floor
Philadelphia. PA 19102

**Counsel for Appellant, W.P.:**
Ilana F. Ehrlich. Esquire
Defender Association of Philadelphia
1441 Sansom Street. 9th Floor
Philadelphia. PA 19102

**Counsel for Mother:**
Robin Winthrop Banister. Esquire
1810 S. Rittenhouse Square. #806
Philadelphia, PA 19103

**Trial Counsel for DHS:**
Anne Cunningham. Esquire
Law Department, Child Welfare Unit
1515 Arch Street. 16th Floor
Philadelphia. Pa 19102

**Appellate Counsel for DHS:**
Kathleen Bola Kim, Esquire
Law Department. Child Welfare Unit
1515 Arch Street. 16th Floor
Philadelphia. PA 19102

**Appellate Counsel for DHS:**
Robert D. Aversa. Esquire
Law Department, Child Welfare Unit
1515 Arch Street. 16th Floor
Philadelphia, PA 19102

December 3, 2024

Date

Cateria R. McCabe. Judge

12